## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER BAUGHCUM, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:21-cv-00036-DHB-BKE |
| | ) | |
| GENOLA JACKSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### Introduction

The Second Amendment "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." *District of Columbia v. Heller*, 554 U.S. 570, 580, 581, 592 (2008). Plaintiffs Christopher Baughcum Jr., Zane Myers, and Sophie Long ("the Individual Plaintiffs") are adult Americans between the ages of 18 and 21. They may vote, enter contracts, and marry. They are eligible to serve in the military. And yet, under O.C.G.A. § 16-11-129(b)(2), they are forbidden from acquiring a Georgia Weapons License and carrying a handgun on their person in public places. This is so even though at the time the Second Amendment was adopted, 18-year-old men were universally understood to be members of the militia not just allowed but *required* to possess firearms.

This Court should invalidate the ban on 18-to-20-year-olds carrying handguns because Plaintiffs have a constitutional right to carry handguns on equal footing with all other adults. Because Georgia's law amounts to a total prohibition on that activity by any Georgians between 18 and 21 years old, it is unconstitutional and this Court need not analyze the law under any of the familiar "tiers of scrutiny." After all, "the enshrinement of constitutional rights necessarily takes

certain policy choices off the table." *Heller*, 554 U.S. at 636. Even if some level of scrutiny were appropriate, the law should still be invalidated. Only the Probate Judges attempt to offer any justification for the law, suggesting it furthers an interest in reducing gun crime, but the connection between the law and that goal is tenuous. It cannot survive even intermediate scrutiny.

Defendants make several arguments urging dismissal, but none are persuasive. Defendant Chris Wright, Commissioner of the Georgia Department of Public Safety ("Commissioner") argues that Plaintiffs lack standing to sue him because their injuries are not "fairly traceable" to his conduct. But the license application form he is required by law to provide, O.C.G.A. § 16-11-129(a), reflects that anyone under 21 who does not fit into a relevant eligibility exemption is ineligible to acquire a license. If Plaintiffs prevail, the form will need to be updated, and Commissioner Wright is the official responsible for its contents. Defendants Genola Jackson, Janice D. Spires, and Kathryn B. Martin ("Probate Judges") argue that Plaintiffs lack standing and that their claim is not ripe because they have not actually sought licenses or violated Georgia law by carrying without a license, but neither action is necessary to make the purely legal issues in this case ripe for review.  The Probate Judges also argue that they are entitled to judicial immunity, but in granting weapons carry licenses, they are not executing a judicial function and therefore are not entitled to immunity for their role in implementing Georgia's law.  For these reasons, the Court should deny Defendants' motions to dismiss and grant summary judgment in Plaintiffs' favor.

## Background

Plaintiffs challenge the constitutionality of Georgia statutes that bar 18-to-20-year-olds from exercising their right to keep and bear arms for the lawful purpose of self-defense. In Georgia, "[n]o person shall carry a weapon without a valid weapons carry license unless he or she meets [certain limited] exceptions to having such a license." O.C.G.A. § 16-11-126(h). A "weapon" is

defined as a knife or a handgun. *Id.* § 16-11-125.1(5). And unless an individual is an active or honorably discharged member of the military, "[n]o weapons carry license shall be issued to . . . [a]ny person younger than 21 years of age." O.C.G.A. § 16-11-129(b)(2)(A). Thus, subject to minor exceptions not applicable here, in Georgia ordinary, law-abiding adults 18-to-20-years-old are categorically barred from carrying a loaded handgun for purposes of self-defense. Initial violations of the license requirement can be punished by a $1,000 fine and twelve months' imprisonment and each subsequent violation within a five-year span is a felony punishable by imprisonment of not less than two and up to five years, *id.* § 16-11-126(i); 17-10-3.

These provisions (collectively, "the Carry Ban") are carried out by the Defendants in this action. The Commissioner is charged with "furnish[ing] application forms and license forms" for individuals seeking weapons carry licenses. O.C.G.A. § 16-11-129(a)(3)(B)(iii). The forms must "be designed to elicit information from the applicant pertinent to his or her eligibility under this Code section," *id.*, including, *only* for individuals under 21, asking whether they are active or honorably discharged members of the military. Completed forms are reviewed by the Probate Judges, who must issue licenses to any applicant who has submitted to a mandatory background check and is not ineligible on account of their age, criminal record, or mental health history. *Id.* § 16-11-129(a)(1), (b) & d(1)(A). The Probate Judges do not have discretion in the matter—the statute *requires* them to issue a weapons carry license to any qualified applicant within 10 days of receiving the results of the background investigation "unless facts establishing ineligibility have been reported or unless the judge determines such applicant has not met all the qualifications, is not of good moral character, or has failed to comply with any of the requirements contained in this Code section." *Id.* § 16-11-129(d)(4).

The Individual Plaintiffs (Baughcum, Meyers, and Long) are all responsible, law-abiding

citizens between 18- and 21-years-old, residents of Georgia, who have never been members of the armed forces and are not disqualified by anything but their age from exercising their Second Amendment rights under Georgia's licensing system. Compl. ¶¶ 38–42, 50, 53–57, 65, 68–72, 80; Baughcum Decl. ¶¶ 1, 3; Meyers Decl. ¶¶ 1, 3; Long Decl. ¶¶ 1, 3. Baughcum is a student who works a part time job in a machine shop. Compl. ¶ 39; Baughcum Decl. ¶ 6. He owns a Smith and Wesson Shield EZ handgun that he is not allowed to carry for purposes of self-defense, even though he has become increasingly concerned with a rise in violent crime in his area and his job frequently requires him to travel alone in higher crime areas to drop off products and pick up raw materials. Compl. ¶¶ 44, 46–47; Baughcum Decl. ¶¶ 5–6, Meyers is a full-time electrician who also often travels alone for work to public areas and does so in a work truck that contains a lot of valuable tools and equipment. Compl. ¶¶ 54, 59; Meyers Decl. ¶ 6. Like Baughcum, Meyers owns a handgun that he would carry in public for self-defense purposes but cannot because he cannot acquire a weapons license. Compl. ¶ 61–62; Meyers Decl. ¶¶ 5–6. Long is a full-time student, dual enrolled in high school and a local community college, and she works part time as a barista. Compl. ¶ 69; Long Decl. ¶ 6. She and her friends have been harassed when going around town to run errands in areas with local reputations for street crime. Compl. ¶ 74; Long Decl. ¶ 6. Long would acquire a handgun and carry it on her person, but like the other Individual Plaintiffs, she is ineligible for a weapons license due to her age. Compl. ¶¶ 76–77; Long Decl. ¶ 5.

The Firearms Policy Coalition ("FPC") is a nonprofit organization dedicated to promoting the right to keep and bear arms. Compl. ¶ 21; Combs Decl. ¶ 3. FPC has members between 18 and 21 years old, including the Individual Plaintiffs, and it brings this action on behalf of its 18-to-20-year-old members in Georgia who have been adversely and directly harmed by Defendants' enforcement of the Carry Ban. Compl. ¶ 21, 43, 58, 73; Combs Decl. ¶¶ 4–6; Baughcum Decl. ¶ 2;

Meyer Decl. ¶ 2; Long Decl. ¶ 2.

Plaintiffs initiated this action on May 20, 2021. *See* Compl., Doc. 1. All Defendants moved to dismiss the action on August 10, 2021. *See* Mot. to Dismiss Compl. of Def. Col. Chris Wright, Doc. 17; Mot. to Dismiss by Defs. Jackson, Martin and Spires, Doc. 19. Plaintiffs now respond in opposition to those motions and move for summary judgment in their favor.

## Argument

### I.  Standards of Review

 "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (quotation omitted). "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014). The Court must view the evidence supporting the motion in the light most favorable to the opposing party. *Id.*

### II.  This Court Has Jurisdiction to Hear Plaintiffs' Challenge to the Ban.

#### A.  Plaintiffs Have Standing to Assert Claims Against All Defendants.

To have standing, a litigant must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) All Defendants assert that the Complaint should be dismissed because Plaintiffs lack standing.

**1.** The Commissioner argues that Plaintiffs cannot show that their injury is "fairly traceable" to his conduct because the Department of Public Safety only "provid[es] blank forms" for license applications to the Probate Judges who process requests for licenses. Comm'r Br. 7.

The Commissioner admits that "license application forms contain a space for applicants to enter their date of birth. But that does not show, or even suggest, that the providers of the form

have a role in determining who is or is not eligible for a license." *Id.* But this understates the Commissioner's role. In addition to date of birth, the form makes clear that if the applicant's age is "<21" the applicant must check a box and "attach proof of completed basic training or honorable discharge." Application for Weapons Carry License, Ex. A. The reason for this is clear: under Georgia law, 18-to-20-year-olds are eligible for a license only if they are serving in or honorably discharged from the military. O.C.G.A. § 16-11-129(b)(2). Because of this, individuals under twenty-one simply cannot fully complete and submit the form if they have not served in the military. That will need to be changed if Plaintiffs succeed in this lawsuit, and the Commissioner is the one with the power under state law to make the change.

The Commissioner argues that separation of powers and the statutory scheme leave him with no say in who gets a license to carry. But at issue in this case is two different types of "enforcement" of the Carry Ban. One, determining whether to issue a license, is the responsibility of the Probate Judges. *See* O.C.G.A. § 16-11-129(a)(1). The other, is the requirement that the Commissioner "furnish application forms and license forms" for handgun carry licenses. O.C.G.A. § 16-11-129(a)(3)(b)(iii). Traceability merely requires a "causal connection" that "link[s] the injury to the complained-of conduct." *Strickland v. Alexander*, 772 F.3d 876, 885 (11th Cir. 2014). Because the forms require anyone under 21 to indicate and furnish proof of military service to complete the form, and because the Commissioner is indisputably charged with providing that form, Plaintiffs' inability to acquire a handgun license, or even to apply for one, is fairly traceable to the Commissioner. *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (noting traceability's connection to enforcement power).

**2.** The Probate Judges also make a traceability argument, claiming that, because they lack a role in prosecuting violations of firearms laws, a pre-enforcement challenge cannot be brought

against them. Judges' Br. 5. As with the Commissioner's argument, this misunderstands what "enforcement" of the Ban looks like. Plaintiffs allege that the licensing process unlawfully prevents them from even being considered for a carry license. They seek, among other relief, a declaration that the current process is unlawful and an injunction preventing the Probate Judges from continuing to apply the Carry Ban. The Probate Judges are undeniably charged by statute with determining eligibility for a carry license. That their actions are not prosecutorial but "ministerial in nature" does not alter the fact that "[if] the rules they [are] executing are unconstitutional, their actions cause[ the] injury to [the plaintiffs'] legal rights," and Plaintiffs' injuries are directly traceable to their actions. *Strickland*, 772 F.3d at 886 (quotation omitted).

**3.** Finally, the Probate Judges argue that Plaintiffs lack standing because they have not applied for licenses or violated the law by carrying illegally without one and "plaintiffs allege no prior threats against them or any characteristics indicating an especially high probability of enforcement against them." Judges' Br. 6 (quoting *Seegars v. Ashcroft*, 396 F.3d 1248 (D.C. Cir. 2005)). But the requirement for demonstrating "an especially high probability of enforcement" has been recognized by the D.C. Circuit itself as out of step with the Supreme Court's "far more relaxed stance on pre-enforcement challenges." *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007). All that the Supreme Court requires is "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (quotation omitted); *see also Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1304 (11th Cir. 2017). That requirement is certainly met here. There is no question that Plaintiffs would be denied a license—they cannot even complete an application. Applying would be futile and "courts have long recognized circumstances in which a failure to apply may be overcome by facts which

demonstrate the futility of such application." *Terry v. Cook*, 866 F.2d 373, 378 (11th Cir. 1989)

*see also, e.g., Brett v. Jefferson Cnty.*, 123 F.3d 1429, 1432 n.9 (11th Cir. 1997) ("[T]he failure to

apply is irrelevant to a First Amendment claim if the application would have been futile."). Here,

there is no dispute that an application would be futile.[1]

### B.  Plaintiffs' Claims Are Ripe.

The Probate Judges next claim that Plaintiffs' claims are not ripe because they have not

been denied licenses or prosecuted for carrying without licenses. Judges' Br. 7. "In assessing

whether a dispute is concrete enough to be ripe, [courts] evaluate (1) the fitness of the issues for

judicial decision and (2) the hardship to the parties of withholding court consideration."

*Wollschlaeger*, 848 F.3d at 1304 (quotations omitted).

"This is one of those cases where the Article III standing and ripeness issues boil down to

the same question." *Id.* (cleaned up). For the same reasons that the Plaintiffs need not violate the

law or submit facially deficient applications for licenses to have standing to challenge the 18-to-

20-year-old Ban, they do not need to do those things to make their purely legal argument fit for

judicial decision. *See Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir.

2019) (Challenges presenting "purely legal issues" are "presumptively ripe for judicial review.").

Forcing them to do either of those things constitutes sufficient hardship to warrant review. *See*

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 & n.8 (2007).

### C.  Venue Is Proper Before This Court.

The Probate Judges do not argue that venue is improper before this Court, but "preserve a

challenge to venue so as to avoid waiver of the issue." Judges' Br. 12. There is nothing to

---

[1] Defendants argue that FPC cannot establish standing or ripeness for the same reasons that the individual Plaintiffs cannot. *See* Comm'r Br. 8–9; Judges' Br. 8–9. Because those arguments are dependent on finding that the Individual Plaintiffs lack standing or present unripe claims, they must fail for the same reasons.

challenge. "A civil action may be brought in . . . a judicial district in which *any* defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). The Probate Judges are residents of Georgia and Jackson resides in Laurens County, in this judicial district. Although transfers can be permitted "[f]or the convenience of parties and witnesses, in the interest of justice," 28 U.S.C. § 1404(a), the Judges acknowledge that "efficiency and uniformity tend to favor a single case in a single forum" and do not argue that litigating the purely legal issues presented by this case in this forum is inconvenient. Judges' Br. 12.

### III. Immunity Does Not Bar Plaintiffs' Requested Relief.

The Probate Judges assert judicial immunity bars Plaintiffs' claims for damages, injunctive relief, costs, and attorney's fees, unless Plaintiffs can show they "acted in the clear absence of all jurisdiction." *Bolin v. Story*, 225 F.3d 1234, 1239 (11th Cir. 2000); Judges' Br. 2–3. But binding Supreme Court precedent holds that judicial immunity does not bar "injunctive and declaratory relief" against judges. *Pulliam v. Allen*, 466 U.S. 522, 524, 541–42 (1984); *see also id.* at 544 (Powell, J., dissenting). To be sure, and as the Probate Judges note, following the decision in *Pulliam* Congress amended Sections 1983 and 1988 generally to bar injunctive relief and attorney's fees against "a judicial officer" acting in a "judicial capacity," while leaving in place the authority to enter declaratory relief in such cases. *See* 42 U.S.C. §§ 1983, 1988(b). *See Esensoy v. McMillan*, 2007 WL 257342, at *1 n.5 (11th Cir. 2007). The upshot is that *even if* the Probate Judges act in a judicial capacity when processing carry licensing applications, neither judicial immunity nor federal law would entitle the Probate Judges "to dismissal from this action," Judges' Br. 4, because Plaintiffs' claims for declaratory relief against them could go forward.

While Plaintiffs' declaratory relief claims plainly are not barred by judicial immunity, neither judicial immunity nor federal law bar the other forms of relief Plaintiffs seek because Probate Judges do not act in a judicial capacity when processing carry license applications.

"Whether a judge's actions were made while acting in his judicial capacity depends on whether: (1) the act complained of constituted a normal judicial function; (2) the events occurred in the judge's chambers or in open court; (3) the controversy involved a case pending before the judge; and (4) the confrontation arose immediately out of a visit to the judge in his judicial capacity." *Sibley v. Lando*, 437 F.3d 1067, 1070 (11th Cir. 2005).

Under O.C.G.A. § 16-11-129(a)(1), "[t]he judge of the probate court of each county shall, on application under oath, on payment of a fee of $30.00, and on investigation of the applicant pursuant to subsections (b) and (d) of this Code section, issue a weapons carry license." This is not a judicial function but rather one of "the administrative . . . or executive functions that judges may on occasion be assigned by law to perform." *Forrester v. White*, 484 U.S. 219, 227 (1988). In many, if not most other states, review of similar applications is processed by the state police, *see* 430 ILCS 65/2 (Illinois); Tex. Govt. Code Ann. § 411.174 (Texas), or a county sheriff, *see* Minn. Stat. Ann. § 624.714 (Minnesota); 18 Pa. Cons. Stat. § 6109 (Pennsylvania). And in New Jersey, which like Georgia delegates review of license applications to its judges, the Supreme Court has concluded that in providing for "a Superior Court judge to issue [each weapons carry] permit . . . the Legislature has reposed what is essentially an executive function in the judicial branch. . . . [It is] clearly non-judicial in nature." *In re Preis*, 573 A.2d 148, 151 (N.J. 1990) (citations omitted). In West Virginia, a similar scheme was declared unconstitutional under West Virginia's separation-of-powers doctrine because "(1) no judicial power is exercised in granting or denying a license to carry a concealed, deadly weapon; and (2) the regulation of the right to carry a concealed, deadly weapon is exclusively a legislative function." *Application of Dailey*, 465 S.E.2d 601, 610 (W.V. 1995).

Granting or denying an application is compelled by the eligibility requirements in the

statute—the "investigation" described in the statute merely involves determining whether certain exceptions apply based on the face of the application and requesting a background check from law enforcement. It does not "involve judicial discretion; in other words, the judge [does] not utilize his education, training, and experience in the law" to decide whether to grant a license. *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 222 n.3 (5th Cir. 2009) (quotation omitted). Rather, it is more like issuing a marriage license, or one of the many other "ministerial functions" that probate judges may be "provided by law" to perform.  O.C.G.A. § 15-9-30; *see also Comer v. Ross*, 28 S.E. 387, 387 (Ga. 1897) ("The ordinary [or probate judge], under our laws, is an official charged with the performance of duties judicial, ministerial, and clerical. Not by his title, but only by his acts, can the exact capacity in which he appears ever be known upon any special occasion.").

Other elements of the statutory scheme also weigh against finding the issuance of a weapons license is a "judicial" function. For instance, O.C.G.A. § 5-3-2, requires (subject to exceptions not relevant here) that "[a]n appeal shall lie to the superior court from *any decision* made by the probate court, except an order appointing a temporary administrator." (emphasis added). But "[w]hen an eligible applicant fails to receive a license" as required, his or her remedy is to "bring an action in mandamus or other legal proceeding in order to obtain a license." *Id.* § 16-11-129(j). In other words, while ordinary judicial *decisions* of probate judges are subject to appeal, a weapons license application denial is not treated that way and requires the applicant to initiate, for the first time, a legal proceeding to seek a license.

Furthermore, the statute requires that, if an applicant succeeds in his mandamus action against a probate judge, the probate judge shall pay "his or her costs in such action, including reasonable attorney's fees." *Id.* In light of the doctrine of judicial immunity, allowing an award of attorney's fees against a judge is at least unusual if the judge were acting in a judicial capacity, if

11

not illegitimate. Here, if the court were to read the Ban's delegation of the duty to award licenses to probate judges as creating a new judicial function for them to execute, it would potentially render the fee-shifting provision a nullity and raise questions about the conflict between the given mandamus remedy and the right to appeal provision in Section 5-3-2. These issues are wholly avoided by construing the law to contemplate probate performing an administrative or executive function rather than a judicial function when processing carry license applications.

The other factors also all weigh against finding judicial immunity. Neither the filing nor the processing of applications occurs in open court or in judicial chambers—the application is filed with a clerk and the investigation is primarily performed by police who conduct the background check, it does not involve any case pending before the judge, and applicants for firearms licenses do not appear before the probate judges in their judicial capacity. Therefore, in light of the practices of other states that vest the power to grant applications in non-judicial officers, the several indications in the statute itself that the probate judges are not fulfilling ordinary judicial functions, and each of the other *Sibley* factors, the court must conclude the Probate Judges are not entitled to judicial immunity in this case.[2]

The other "line of authority" that the Probate Judges suggest bars Plaintiffs' action is inapposite. *See* Judges' Br. 4. Each of the cases the Probate Judges cite deals with the inability of the federal courts to issue mandamus relief against a state court, *see, e.g.*, *Lamar v. 118 Judicial Dist. Court of Tex.*, 440 F.2d 383, 384 (5th Cir. 1971), but Plaintiffs do not seek mandamus.[3]

## IV.   Plaintiffs Are Entitled to Summary Judgment on their Facial Challenge Because the

---

[2] The Probate Judges' argument that they cannot be liable for costs and attorney's fees based on 42 U.S.C. § 1988, *see* Judges' Br. 11, also fails because this case does not involve actions taken by a judicial officer "in such officer's judicial capacity." 42 U.S.C. § 1988(b).

[3] The Probate Judges also argue Eleventh Amendment immunity bars the award of nominal damages against them in their official capacities. Judges' Br. 10–11. Plaintiffs agree to dismiss their claims for nominal damages.

**Ban Unlawfully Infringes Their Second Amendment Rights.**

"In analyzing a Second Amendment claim, [the Eleventh Circuit] has followed a two-step analysis: first, [courts] ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, [courts] apply the appropriate level of scrutiny." *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015) (cleaned up). The Eleventh Circuit has left open, however, the question of whether this two-step inquiry is necessary in cases "in which the Second Amendment right was 'destroyed,' " as in a case where a law "generally ban[s] the carriage of firearms everywhere outside the home." *See id.* at 1325–26. "The Second Amendment . . . is the very *product* of an interest balancing by the people" and any additional "interest balancing" regarding an outright prohibition on an entire class of people exercising that right is inappropriate. *Heller*, 554 U.S. at 635.

### A. Plaintiffs Have a Fundamental Right to Carry Handguns Outside the Home for Lawful Purposes.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "On the basis of both text and history," the Amendment confers "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595, that is "among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010).

### 1. All Citizens Over Eighteen Have Full Second Amendment Rights.

"*Heller* held that the Second Amendment 'codified a pre-existing right,' so the courts must consider the Amendment's historical background to understand its content." *GeorgiaCarry.org*, 788 F.3d at 1327 (quoting *Heller*, 554 U.S. at 592). Of course, courts must also pay close attention to the Amendment's text and structure in interpreting it. *See Heller*, 554 U.S. at 577. "[T]he text and structure of the Second Amendment, along with its place within the Constitution as a whole,

13

reveal that it protects 18- to 20-year-olds." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 421 (4th Cir. 2021).

Regarding the text, the Amendment describes a right of "the people" to bear arms and makes no mention of age. *See id.* (contrasting the Second Amendment with provisions of the Constitution that set age requirements). The phrase "the people" is used in two other amendments—the First and the Fourth, *see Heller*, 554 U.S. at 579—and both of those amendments apply to all people regardless of age, *Hirschfeld*, at 422 (collecting cases). And even those rights that do not apply equally regardless of age apply at least to those 18 or older. *Id.* at 423 (discussing jury trial right and unenumerated rights of marriage and sex).

History proves 18-year-olds were included within the Second Amendment's scope. The prefatory clause—"A well regulated Militia, being necessary to the security of a free State"— "announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller* 554 U.S. at 595, 599. Therefore, although the right is not coextensive with the duty to serve in the militia (it is unquestionably broader and includes, for example, women), "[l]ogic demands that there be a link between the stated purpose and the command." *Id.* at 577. The "militia" referenced in the prefatory clause was not an organized army but rather the collection of "all able-bodied men." *Id.* at 596. And "[n]ear the time of ratification, the federal government and every state required 18-year-old men to be part of the militia and bring their own arms." *Hirschfeld*, 5 F.4th at 424. The first federal militia act called for enrollment of "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years and under the age of forty-five years," Act of May 8, 1792, ch. 33 § 1, 1 Stat. 271, 271. State militia laws followed suit. Pre-ratification most states began enlistment at 16 and after the federal law set the age at 18, "every state also set their militia age at 18." *Hirschfeld*, 5 F.4th at 429; *see*

*also id.* at 453–57 (App'x 1). "Like the federal Militia Act, these state militia laws required enrolled citizens, including 18-year-olds, to bring their own firearms and ammunition either explicitly or as a general background principle." *Id.* at 429. In short, "the historical basis for those 18 and older having Second Amendment rights rests on firm ground." *Id.* at 441.

### 2. Carrying Handguns Outside the Home Is a Necessary Component of "Keep[ing] and Bear[ing] Arms."

*Heller* and *McDonald* require finding that carrying handguns outside the home is a protected Second Amendment activity. *Heller* held that "self defense . . . was the *central component* of the [Second Amendment] right" and accordingly that the government cannot so regulate guns as to make them no longer useful for the "lawful purpose of self-defense." 554 U.S. 599, 630. And *McDonald* reiterated that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day" that is protected by the Second Amendment. 561 U.S. at 767. As the Eleventh circuit has noted, "[the Second Amendment] codified a pre-existing 'individual right to possess *and carry weapons* in case of confrontation.' " *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017) (quoting *Heller*, 554 U.S. at 592) (emphasis added). While *Heller* and *McDonald* note "the need for defense of self, family, and property is most acute" in the home, 554 U.S. 628; 561 U.S. 767, "that doesn't mean it is not acute outside the home. *Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home, as when it says that the amendment 'guarantee[s] the individual right to possess and carry weapons in case of confrontation,' " *Moore v. Madigan*, 702 F.3d 933, 935–36 (7th Cir. 2012) (quoting *Heller*, 554 U.S. at 592); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 657 (D.C. Cir. 2017). "To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d. at 937.

It is also to divorce the Second Amendment from its text. The Amendment states that "the

right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). To confine the Second Amendment's application to the home would read the second guarantee—the right to bear arms—out of the Constitution altogether. As the Court explained in *Heller*, "the natural meaning of 'bear arms' " is to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed for offensive or defensive action in a case of conflict with another person.' " 554 U.S. at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). That definition shows that the right must include, "in the Court's own words, the 'right to possess *and carry* weapons in case of confrontation.' " *Wrenn*, 864 F.3d at 658 (quoting *Heller*, 554 U.S. at 592) (emphasis in *Wrenn*). "To speak of 'bearing' arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore*, 702 F.3d at 936.

History reinforces this reading. For this analysis, the most pertinent historical period is that leading up to and encompassing the adoption of the Second Amendment. That is because the Second Amendment's scope is established by "the public understanding in 1791." *Gamble v. United States*, 139 S. Ct. 1960, 1975 (2019). While *Heller* also consulted later sources, they "were treated as mere confirmation of what the Court thought had already been established." *Id.* at 1976.

Here, there can be no doubt that the Founding-era public understood the right to keep and bear arms to include a right to bear arms in public. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling or attending church. Nicholas J. Johnson & David B. Kopel et al., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). And even when not required, arms carrying was common. As Judge St. George Tucker observed in 1803, "In many parts of the United States, a man no more thinks of

going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 William Blackstone, Commentaries App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

Consistent with Tucker's observations, our leading founders practiced and advocated for carrying firearms in public. George Washington regularly used a gun for hunting, PAUL L. HAWORTH, GEORGE WASHINGTON: FARMER 255 (1915), and carried a firearm on a trip into the Ohio Country, WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). In defending the British soldiers charged in the Boston Massacre, John Adams noted that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And Adams was so fond of shooting for sport that as a schoolboy he used to take his gun "to school and leave it in the entry and the moment it was over went into the field to kill crows and squirrels." 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257–61 (L.H. Butterfield ed., 1961). Thomas Jefferson advised his nephew to "[l]et your gun … be the constant companion on your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of August 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, MONTICELLO, https://bit.ly/3hJJsvb. James Madison's marksmanship was such that he "should not often miss . . . on a fair trial at [100 yards'] distance." 1 THE PAPERS OF JAMES MADISON 151–54 (William T. Hutchinson & William M.E. Rachal eds., 1962). James Monroe described how he "kept my pistols by me in the carriage"

when traveling. 5 THE PAPERS OF JAMES MONROE 294 (Daniel Preston ed., 2014). John Quincy Adams' diary repeatedly records events such as "went out with the gun," John Quincy Adams, *October 6, 1785*, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/3kmmtIt, or "went with my gun down upon the marshes," John Quincy Adams, *August 29, 1787*, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/3reIdaq. The actions of our first six Presidents refute any notion that the right to bear arms is limited to the home.

Against this backdrop, it is unsurprising that throughout the nineteenth century, courts that evaluated laws restricting carriage outside the home considered carriage to be protected activity. *See Wrenn*, 864 F.3d at 658 (collecting cases). In fact, excluding cases that assumed the right to bear "was only about militias and not personal self-defense"—a conclusion that is a non-starter after *Heller*—"the remaining cases speak with one voice [in favor of] the Amendment's coverage of carrying as well as keeping arms." *Wrenn*, 864 F.3d at 658 (quotations omitted).

Finally, common sense dictates that, if the Second Amendment protects the right to self-defense, it should apply outside the home because self-defense "is as important outside the home as inside." *Moore*, 702 F.3d at 942.  In fact, it can be more important:

> A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress.

*Id.* at 937. According to the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage. *See* BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), https://bit.ly/3sl6490. All evidence thus points to one conclusion—the Second Amendment protects the right to carry firearms outside the home for lawful purposes such as self-defense and hunting.

**B.  The Outright Ban on Exercise of Plaintiffs' Second Amendment Rights Cannot Survive Under Any Level of Scrutiny.**

**1.** Because the Carry Ban restricts Plaintiffs' exercise of their Second Amendment rights, the Court must decide whether the Ban "pass[es] muster under the appropriate level of scrutiny[.]" *GeorgiaCarry.org*, 788 F.3d at 1324. Although ordinarily, this involves asking "how close the law comes to the core of the Second Amendment right[4] and the severity of the law's burden on the right" and comparing that burden against "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights, *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 38 F. Supp. 3d 1365, 1371 (N.D. Ga. 2014) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)), this case presents "the rare law that destroys the Second Amendment right altogether, thereby obviating any need for scrutiny analysis and requiring *Heller*-style per se invalidation." *GeorgiaCarry.org*, 788 F.3d at 1325 (cleaned up).

As just discussed, "possession and carrying are on par with each other," *Wrenn*, 864 F.3d at 664, so any law that completely prohibits some class of people from exercising their right to bear arms should be subject to the same categorical treatment to which the law in *Heller* was subject. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table," and no justification can save the Carry Ban. *Heller*, 554 U.S. at 636. As the D.C. Circuit explained in *Wrenn*: "[I]f the Amendment is for law-abiding citizens *as a rule*, then it must secure gun access at least for each *typical* member of that class" measured as "those with common levels of competence and responsibility—and need." 864 F.3d at 665.

The Carry Ban does not allow typical 18-to-20-year-olds to carry handguns—only

---

[4] Although *Heller* spoke of a "core lawful purpose" and "core protection" of the Second Amendment, *see* 554 U.S. at 630, 635, several courts have inappropriately used this language to narrow the Second Amendment by distinguishing between "core" Second Amendment rights and others that are entitled to less protection. Plaintiffs acknowledge that this Court is bound to apply Eleventh Circuit precedent but raises the issue to preserve it for *en banc* or Supreme Court review.

members (or honorably discharged former members) of the armed forces. It acts as a "total ban[]

on carrying . . . by ordinarily situated *individuals* covered by the Amendment" that must be subject

to the same treatment as any other total ban under *Heller*—invalidation. *Id.* at 666. To put it all

together concisely, it is "enough to sink this law under *Heller*" that while the Second Amendment

generally protects "the right of responsible citizens to carry firearms for personal self-defense

beyond the home," the Carry Ban "is necessarily a total ban on exercises of that constitutional right

for most" 18-to-20-year-old Georgians. *Id.* at 667.

**2.** If this Court elects to analyze the Carry Ban under one of the traditional tiers of scrutiny,

strict scrutiny should apply. "[T]he right to keep and bear arms [is] among those fundamental rights

necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, and "if [a] law impinges

on a fundamental right, it is subject to strict scrutiny." *Leib v. Hillsborough Cnty. Pub. Transp.

Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). The Ban "is not merely regulatory; it *prohibits*

the 'law-abiding, responsible citizens' " of Georgia from carrying handguns for self-defense until

they are 21 years old; in other words, it imposes a substantial burden on Plaintiffs' Second

Amendment rights. *See Ezell*, 651 F.3d at 708; *see also Moore*, 702 F.3d at 940.

**3.** Even under intermediate scrutiny, the Ban must still be invalidated. Intermediate scrutiny

requires that the government asserts "an important governmental objective" and show the

challenged law is "substantially related" to advancing that objective. *Danskine v. Miami Dade

Fire Dept.*, 253 F.3d 1288, 1294–95 (11th Cir. 2001). "The burden of justification is demanding

and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The Probate

Judges rely on a Fifth Circuit case upholding a similar law in Texas to argue that the Carry Ban

should survive intermediate scrutiny, citing the Fifth Circuit's conclusion that "Texas determined

that a particular group was generally immature and that allowing immature persons to carry

handguns in public leads to gun violence." *NRA of Am., Inc. v. McCraw*, 719 F.3d 338, 349 (5th Cir. 2013); Judges' Br. 10. But as the Eleventh Circuit has explained, under "the intermediate scrutiny evidentiary inquiry . . . [u]nsupported generalizations will not suffice." *Danskine*, 253 F.3d at 1294 (quotation omitted). "While the Constitution may not require a specific method of proof . . . some reference to legislative findings, academic studies, or other empirical data is necessary to support the categorical disarmament of citizens." *Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 837 F.3d 678, 694 (6th Cir. 2016). Because the Second Amendment places possession and carriage of arms on equal footing, the same should be true for the Carry Ban. In moving to dismiss, the Probate Judges have offered no support for the assertion that 18-to-20-year-olds are "generally immature" in a way that "leads to gun violence" and did not even assert that Georgia had enacted the Carry Ban because it believed that was the case. They have not argued, as they must, that the "evidence is sufficient to show that the [restriction on the rights of 18-to-20-year-olds] rests on evidence-informed analysis rather than on stereotypical generalizations." *Danskine*, 253 F.3d at 1294–95 (quotation omitted); *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (holding intermediate scrutiny in the speech context "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree").

Accepting, for the sake of argument, that the same concern that motivated Texas in *McCraw* motivated Georgia here, that still cannot satisfy intermediate scrutiny because Defendants cannot show a fit between the identified government interests and the Carry Ban. In *Craig v. Boren*, 429 U.S. 190 (1976), applying intermediate scrutiny, the Supreme Court enjoined a law prohibiting the sale of low-alcohol beer to men under 21 (but allowing women 18 and older to buy it). *Id.* at

191. After reviewing statistics showing 18-to-20-year-old males were responsible for a disproportionate number of drunk driving incidents, the court accepted that 2% of males and just 0.18% of females had been arrested for drunk driving but held the law invalid under intermediate scrutiny. *Id.* at 200–02. The Court reasoned, "if maleness is to serve as a proxy for drinking and driving, a correlation of 2% must be considered an unduly tenuous 'fit.' " *Id.* at 201–02.

The two-percent fit in *Craig* is significantly better than what Defendants can offer here. Available data shows that 18-to-20-year-old adults commit *fewer* violent crimes than those who are 21-to-24-years-old. *See* Off. of Juvenile Justice & Delinquency Programs, *Estimated number of arrests by offense and age group, 2019, Gender: All*, U.S. Dep't of Just. (Aug. 17, 2021) (showing that 18-to-20-year-olds were arrested for 41,250 violent crimes in 2019, compared with 58,850 violent-crime arrests for 21-to-24-year-ods), https://bit.ly/3eOU8Gl. That remains true when considering criminal violence on a per capita basis, with just 0.32% of 18-to-20-years-olds arrested for violent crimes in 2019, compared with 0.34% of individuals 21-to-24-year-old. Off. of Juvenile Justice & Delinquency Programs, *Arrest Rates by offense and age group, Gender: All*, U.S. Dep't of Just. (Aug. 17, 2021), https://bit.ly/3gWR4KP. "[A]n exceedingly small percentage, around 0.3% and definitely less than 1%, of the 13 million young adults [18-to-20-years-old] commit [violent] crimes." *Hirschfeld*, 5 F.4th at 445.[5] "*Craig* explains why such laws would fail when it declared that 'a correlation of 2% must be considered an unduly tenuous fit.' . . . The rights of more than 99% of a group cannot be restricted because a tiny fraction of 1% commit a disproportionate amount of violent crime." *Id.* at 446 (quoting *Craig*, 429 U.S. at 201–02). As such, even if the court considers the Carry Ban under intermediate scrutiny and accepts the

---

[5] In fact, as the court in *Hirschfeld* goes on to note, 0.3% likely overstates it, given the statistics about how often violent crime is committed by repeat offenders. *Id.* at 445–46.

proffered government interest from *McCraw* as valid in this case, *Craig* forecloses finding the law is justified by that interest.

The Carry Ban also fails to satisfy intermediate scrutiny for the independent reason that, even if the Defendants could demonstrate that crime by 18-to-20-year-olds is a serious problem warranting government action, there is no evidence that a ban on issuing carry licenses to 18-to-20-year-olds is reasonably connected to that problem. "It is not enough to target guns generally and argue that less access to guns means less crime, as this would justify almost any restriction and eviscerate the Second Amendment." *Id.* at 447. "Official data from numerous states indicates that shall-issue permit holders are unusually law-abiding compared to the population as a whole and do not commit a significant proportion of violent crimes committed with guns." Michael P. O'Shea, *The Steepness of the Slippery Slope: Second Amendment Litigation in the Lower Federal Courts and What It Has to Do with Background Recordkeeping Legislation*, 46 CONN. L. REV. 1381, 1433 & n.259 (2014); *see also* Philip J. Cook et al., *Gun Control after* Heller: *Threats & Sideshows from a Social Welfare Perspective*, 56 U.C.L.A. L. REV. 1041, 1082 (2009) ("Based on available empirical data . . . we expect relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand."). That should not come as a surprise, given that, as in Georgia, applicants for a permit typically must submit to fingerprinting and a background check before a license can issue. O.C.G.A. § 16-11-129(c) & (d)(1)(A). The Carry Ban thus only targets a subset of 18-to-20-year-olds likely to be particularly law-abiding—those who would apply for and obtain a carry license—further diminishing an already tenuous connection between age and violent crime that Defendants have proffered as justification for the restriction. "[A] law that so under-inclusively addresses the government's interest by targeting one of the least problematic [groups responsible

for gun violence] raises serious questions about whether the law actually furthers that interest." *Hirschfeld*, 5 F.4th at 450; *see also Craig*, 429 U.S. at 203.

The option of allowing licensed 18-to-20-year-olds to carry also undermines any justification Georgia may have for the Carry Ban because it is a substantially less-restrictive alternative that Georgia could have tried to address the problem it is purporting to address. Even under intermediate scrutiny, a State cannot justify a flat ban when it has not "seriously undertook to address the problem with less intrusive tools readily available to it" or, at a minimum, rejected such alternatives for good reason. *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 367 (3d Cir. 2016). That is because in the absence of such tailoring a State impermissibly "burden[s] substantially more [protected conduct] than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486. Georgia cannot make such a showing here, and this is an additional reason why the Carry Ban fails heightened review.

### V. Plaintiffs Are Entitled to Summary Judgment on Their As-Applied Challenge Because the Ban Particularly Burdens the Second Amendment Rights of Women.

If the Court concludes the Carry Ban is not facially invalid, it should still conclude that it is invalid as applied to women like Plaintiff Long. *See Williams v. Pryor*, 240 F.3d 944, 955 (11th Cir. 2001). Plaintiffs' as-applied challenge should also lead to a finding of categorical invalidity or, at the very least, application of strict scrutiny. But even under intermediate scrutiny, the Carry Ban cannot be justified to stop 18-to-20-year-old women from carrying handguns because they are exceedingly unlikely to commit violent crime, both absolutely and when compared with men who are allowed to receive licenses. In 2019, for example, only **0.13%** of 18-to-20-year-old women were arrested for a violent crime of any type. *See* Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 1000,000 in age group), Gender: Females*, U.S. DEP'T OF JUST. (Aug. 17, 2021), https://bit.ly/3zmorNV. Males 21-to-24, by

contrast, were arrested for violent crimes at a rate approximately four times greater (0.51%), and *all* males 25 and over were arrested for violent crimes nearly twice as often (0.23%). *See* Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 1000,000 in age group), Gender: Males*, U.S. Dep't of Just. (Aug. 17, 2021), https://bit.ly/3gtPG0i. The distinction is even greater when it comes to homicide, with 18-to-20-year-old females being arrested for murder or nonnegligent homicides at a minuscule rate of **0.0019%**, while 21-to-24-year-old males were arrested for such offenses nearly ten times as often (.018%) and 25-and-over males more than twice as often (.0053%). *See* Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 1000,000 in age group), Gender: Females*, U.S. Dep't of Just. (June 10, 2021), https://bit.ly/3zmorNV; Off. Of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019 (rates per 1000,000 in age group), Gender: Males*, U.S. Dep't of Just. (Aug. 17, 2021), https://bit.ly/3gtPG0i.

The inequity of burdening a woman's right to "keep and bear arms for the purpose of self-defense," *McDonald*, 561 U.S. at 750, is all the more stark given that women are disproportionately *victimized* by crime. In 2016, 68,009 18-to-20-year-old women were victims of violent crime,[6] while just 42,358 men in the same age group were similarly victimized. Off. of Juvenile Justice & Delinquency Programs, *Easy Access to NIBRS Victims: Most serious offense against victim by Sex of victim for all reporting states, 18 to 20,* (Aug. 17, 2021), https://bit.ly/387FeIs, Ex. B.

Accepting that curbing gun violence was Georgia's aim in passing the Carry Ban, it cannot advance that interest by stripping the right to carry a handgun for purposes of self-defense from women who as a group are exceedingly law-abiding and disproportionately likely to be victimized

---

[6] Defined to include murder/nonnegligent manslaughter, kidnapping, rape, sodomy, sexual assault with object, fondling, robbery, aggravated and simple assault, and intimidation.

by criminals. Indeed, applying the Carry Ban to such a class is perverse.

## <u>Conclusion</u>

For the foregoing reasons, the Court should deny Defendants' motions to dismiss and grant Plaintiffs' cross-motion for summary judgment.

August 24, 2021

John R. Monroe
John Monroe Law, P.C.
156 Robert Jones Road
Dawsonville, GA 30534
(678) 362-7650
jrm@johnmonroelaw.com
State Bar No. 516193

Respectfully Submitted,

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
William V. Bergstrom
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
Admitted *pro hac vice*

*Attorneys for Plaintiffs*