**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**DUBLIN DIVISION**

| | |
|---|---|
| CHRISTOPHER BAUGHCUM, JR., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION NO. 3:21-cv-<br>) 00036-DHB-BKE |
| | ) |
| GENOLA JACKSON, et al., | ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

**<u>Introduction</u>**

Plaintiffs are 18-to-20-year-old adult citizens and organizations that count those citizens among their members. They have moved for summary judgment to vindicate their Second Amendment right to carry handguns in public for lawful purposes. Br. in Opp. to Defs.' Mots. to Dismiss and in Support of Pls.' Mot. for Summ. J. ("Pls.' Mot."), Doc. 20-2 (Aug. 24, 2021). Defendants Genola Jackson, Janice D. Spires, and Kathryn B. Martin ("Probate Judges") and Chris Wright, Commissioner of the Georgia Department of Public Safety ("Commissioner") have filed briefs opposing that motion. Probate Judge Defs.' Br. in Opp. to Pls.' Mot. for Summ. J. ("Judges' Opp."), Doc. 31 (Sept. 14, 2021); Resp. of Def. Col. Chris Wright in Opp. to Pls.' Mot. for Summ. J. ("Comm'r Opp."), Doc. 35 (Sept. 28, 2021).

Across the many pages of combined briefing that the Defendants have submitted to this Court, both in support of their own motions to dismiss and in opposition to Plaintiffs' motion for summary judgment, very little space has been given to defending Georgia's Carry Ban on the merits. Here, the Probate Judges even stop short of saying they think the law is constitutional and

1

instead claim Plaintiffs' challenge "is of dubious merit." Judges' Opp. 8. The Commissioner, for his part, seems to concede that the Second Amendment protects the right to carry guns in public, and rather than outright arguing that it does not apply to 18-to-20-year-olds, merely points to cases that have found restrictions on that group justified. But in those cases, the courts ultimately found that the restrictions were reasonable *in light of a government interest that justified them*—a government interest that must be proven by the Defendants. And no Defendant has attempted to carry that burden. As a result, if the Court finds that the Second Amendment protects the right of 18-to-20-year-old citizens to carry handguns in public for lawful purposes, it must find that the Carry Ban is unconstitutional—no possible tier-of-scrutiny can protect the law without a supporting government interest.

The Defendants attempt to derail Plaintiffs' motion before it reaches the merits, but none of their arguments are persuasive. The Commissioner argues that he cannot be sued in his official capacity because he has not caused Plaintiffs' harm, but it is his responsibility—and his alone—to provide carry license application forms that reflect Georgia law, including the Carry Ban. Unless he is a party to the case, a judgment from this Court holding the Ban unconstitutional would be powerless to require him to change those forms. The Probate Judges, for their part, claim that they should be shielded from suit by judicial immunity, but processing applications is not a fundamentally judicial action so no immunity attaches. It is a quirk of Georgia state law that the official designated with the responsibility is a judge and the identity of the official cannot transform this executive task into a judicial one.

That leaves just the constitutional questions: Does the Second Amendment protect the right to carry a gun in public? Does it cover 18-year-olds the same as it does 21-year-olds? The text, context, and history of the Second Amendment plainly dictates that the answer to both of those

questions is "yes." In this case, that means the Carry Ban must be declared unconstitutional and summary judgment awarded to Plaintiffs.

**Argument**

**I.     Plaintiffs Have Standing to Sue the Commissioner in His Official Capacity.**

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must demonstrate he has suffered (or will suffer) "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

Plaintiffs have satisfied each of these requirements here. Were Individual Plaintiffs not precluded from carrying firearms by law they each would carry a handgun for self-defense and other lawful purposes. Decl. of Christopher Baughcum Jr. ¶ 6, Doc. 20-3 (Aug. 24, 2021); Decl. of Zane Meyers ¶ 6, Doc. 20-4 (Aug. 24, 2021); Decl. of Sophie Long ¶ 6, Doc. 20-5 (Aug. 24, 2021). That deprivation of their constitutional rights is an injury in fact. It is traceable to the conduct of both the Commissioner and the Probate Judges because, to lawfully carry a handgun, the Plaintiffs must first complete an application, provided by the Commissioner, O.C.G.A. § 16-11-129(a)(3)(B)(iii), and submit it for review by the Probate Judges, O.C.G.A. § 16-11-129(a)(1), (b) & (d)(1)(A). As a direct result of the Carry Ban, the current form provided by the Commissioner cannot even be completed by the Individual Plaintiffs, since it requires "attach[ing] proof of completed basic training or honorable discharge" for any applicant younger than 21. Doc. 20-8 at 2. And if Plaintiffs submitted a facially deficient application anyway, the Probate Judges would have no choice but to deny the request. It follows that a favorable judgment would redress these injuries, since an injunction forcing the Commissioner to remove the requirement for proof of completed basic training or honorable discharge would leave the Individual Plaintiffs qualified to

3

complete the application and an injunction requiring Probate Judges to hold 18-to-20-year-olds'
applications to the same standard as any other adult's would give them opportunity to exercise
their Second Amendment rights equal to any other Georgian. In fact, any injunction as to just the
Probate Judges or just the Commissioner would risk incompletely redressing Plaintiffs' injuries.
If, for example, this Court finds the Carry Ban unconstitutional but only enjoins the Probate
Judges, the application provided by the Commissioner presumably would remain unchanged and
misinform potential applicants of their eligibility and what they must do to receive a license. To
be sure, if that occurred, Plaintiffs could submit an application that does not include the required
information about military service and the Probate Judges would be bound to grant their licenses
despite the absence of that information, but this does not change the fact that a correct and accurate
application form is a key part of the process for applying for a carry permit and thus for providing
Plaintiffs complete relief.

The Commissioner disputes the traceability and redressability elements of Plaintiffs'
standing. Regarding traceability, the Commissioner argues that "the only role [the Commissioner]
has with respect to the challenged provisions is providing blank license application forms to
probate courts" and since the ultimate decision on licensing rests with the Probate Judges, "[t]he
language on the forms is simply not the reason Plaintiffs are unable to obtain a license." Comm'r
Opp. 7–8. But traceability "does not require the challenged action to be the sole or even immediate
cause of the injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018);
*see also Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) ("This wrongly equates injury 'fairly
traceable' to the defendant with injury as to which the defendant's actions are the very last step in
the chain of causation."). In pre-enforcement actions, "[d]esignation of a proper public official as
a defendant does not require that the official's acts be aimed directly at the plaintiff. 'Standing'

4

requirements can be satisfied by showing that the defendant's acts have caused others to react in a way that injures the plaintiff." WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. § 3531.5 (3d ed.). Put another way, "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to the action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) (citation omitted).

The argument presented by the Commissioner is essentially identical to an argument that was rejected in *Henne v. Wright*, 904 F.2d 1208 (8th Cir. 1990). In *Henne*, plaintiffs sued the Director of the Nebraska Department of Health and the Director of the Nebraska Bureau of Vital Statistics to challenge the constitutionality of a Nebraska law that limited the surnames that parents could give their children at birth. *Id.* at 1209. Although hospital personnel told plaintiffs they could not give their children the names they wanted to give them and would fill out the forms themselves if the plaintiffs would not comply, the court rejected the argument that the government defendants had not caused the injury: "Because defendants furnish the forms and instructions by which hospital personnel in Nebraska effect the surname restrictions, plaintiffs' action directly challenges the conduct of defendants." *Id.* at 1211. The same can be said here. The Commissioner is charged by statute with a role in effectuating the Carry Ban—he provides forms that conform to the eligibility requirements of the Ban, including the age requirements that are challenged here. Those forms carry out the Ban by informing both the decisionmakers and any applicants like the Individual Plaintiffs of the requirement that no one over 18 but under 21 will receive a license without first completing basic training or receiving an honorable discharge.

The Commissioner points to *Jacobson* to argue that his authority to issue forms is insufficient to keep him in this case because the Probate Judges do not depend on the Commissioner for their authority to decide whether to issue a handgun license. But in *Jacobson*,

5

the plaintiffs had relied on the Florida Secretary of State's "general supervision and administration of the election laws" to sue him in a challenge over the ordering of candidates on ballots. *Id.* at 1255. The Secretary's only role with respect to ballots was to "certify to the supervisor of elections of each county . . . the names of persons nominated." *Id.* at 1253 (quoting Fla. Stat. § 99.121) (brackets omitted and ellipsis in original). In fact, the only officials with *any* role in deciding where to place candidates on ballots were the county election supervisors, so the Eleventh Circuit could safely conclude the Secretary of State "didn't do (or fail to do) *anything that contributed* to [plaintiffs'] harm." *Id.* (citation omitted) (emphasis added). Unlike in *Jacobson*, the Commissioner has a specific role in effectuating the Carry Ban, and that role, even if not the ultimate or dispositive one "contribute[s] to [plaintiffs'] harm." *See id.*

The Commissioner emphasizes that in *Jacobson* the Secretary did have the power to "prescribe rules about ballot layout . . . which the Supervisors might well be obliged to follow," *id.* at 1256–57, but there is nothing inconsistent with that fact and with finding standing here. The Eleventh Circuit explained that standing must be rooted in executive responsibility, not rulemaking authority, or else "plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it." *Id.* at 1257. Plaintiffs in this case have not based their challenge on the theory that the Commissioner could in some way regulate the Probate Judges in reviewing applications. His place as a defendant in this case arises out of his own responsibility for providing forms, an action that is unrelated to the "enact[ment]" of the Carry Ban but that is part and parcel of its "execut[ion]." *See id.*

The *Jacobson* court's discussion of the redressability element of standing underscores why the Commissioner *must* be a defendant in this case. The injury suffered by the *Jacobson* plaintiffs was *exclusively* caused by the county election supervisors so "[a]n injunction ordering the

Secretary not to follow the ballot statute's instructions for ordering candidates [could not] provide redress . . . [and a] declaratory judgment against the Secretary [would] not bind the Supervisors, 'who are not parties' to this action" and so "remain lawfully entitled to print candidates' names on the ballot in the order prescribed by Florida law unless and until they are made parties to a judicial proceeding that determines otherwise." *Id.* at 1254. A judgment from this Court to which the Commissioner is not a party will not bind him, and the Carry Ban will still require that he provide forms that note the under-21 age restriction. "[F]ederal courts have no authority to erase a duly enacted law from the statute books," *id.* at 1255 (citation omitted), and Plaintiffs cannot rely on the "persuasive or even awe-inspiring effect of [an] opinion explaining the exercise of [the court's] power" to compel a non-party to respect a judgment that does not bind him, *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment). In fact, with the Carry Ban still state law, the Commissioner presumably would have no choice but to continue to follow it and reflect its requirements in the form. *See Jacobson*, 974 F.3d at 1255.

The Commissioner gets this backwards when he argues that "updat[ing] blank application forms . . . will not redress [Plaintiffs'] injury," because "nothing in the statute permits county probate judges to grant or deny licenses based on the wording of the blank application forms." Comm'r Opp. 10. Redressability does not require that the order against any one defendant will completely alleviate a plaintiff's injury. "The Supreme Court has rejected interpretations of the rule that demand complete redressability, stressing that a plaintiff need show only that a favorable decision would redress 'an injury,' not '*every* injury.'" *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Otherwise, states could avoid judicial scrutiny of patently unconstitutional conduct through the

simple expedient of dividing enforcement duties among multiple officers. But an adverse judgment against only the Probate Judges would be unable to require the Commissioner to do anything. His presence as a defendant is necessary to afford Plaintiffs complete relief.

## II.    Immunity Does Not Bar the Relief Plaintiffs Seek.

### A.    Qualified Immunity and Eleventh Amendment Immunity Do Not Apply.

Both the Commissioner and the Probate Judges argue that qualified immunity protects them from claims for damages in their individual capacities, and the Commissioner also asserts Eleventh Amendment immunity against damages in his official capacity. Comm'r Opp. 10–11; Judges' Opp. 16. Plaintiffs agree to dismiss all claims against the Defendants in their individual capacities, so the Court need not assess the qualified immunity arguments, which only apply to individual capacity claims. Similarly, Plaintiffs only intended to seek damages from the Defendants in their individual capacities and do not seek them based on the remaining official-capacity claims, so the Court need not address the Commissioner's Eleventh Amendment argument either.

### B.    Judicial Immunity Does Not Apply to the Probate Judges' Exercise of Executive Authority.

The Probate Judges argue that the claims against them are barred by judicial immunity. Judicial immunity provides a judge with "absolute immunity from suit for judicial acts performed within the jurisdiction of his court." *McCullough v. Finley*, 907 F.3d 1324, 1330 (11th Cir. 2018). Deciding whether immunity applies involves "ask[ing] whether the judge acted in his judicial capacity" for which the court "look[s] at the nature and function of his act . . . and consider[s] whether the nature and function of the particular act is judicial." *Id.* at 1330–31.

At the outset, it should be emphasized that judicial immunity does not provide immunity from claims for injunctive or declaratory relief. *Pulliam v. Allen*, 466 U.S. 522, 524, 541–42

(1984). Instead, the Probate Judges may only assert statutory immunity under Sections 1983 and 1988, and that immunity imposes no bar to declaratory relief. *See* 42 U.S.C. §§ 1983; 1988(b). Therefore, regardless of what the Court determines with respect to the Probate Judges' immunity, Plaintiffs' declaratory judgment claims should be allowed to proceed. As with judicial immunity, whether statutory immunity is available turns on whether "an act or omission [was] taken in [a judicial] officer's judicial capacity." *Id.* In either case, this Court must "draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges." *Forrester v. White*, 484 U.S. 219, 227 (1988).

The granting of a handgun carry license is not a judicial function, so the Probate Judges are not entitled to immunity. "[T]he paradigmatic judicial act is the resolution of a dispute between parties who have invoked the jurisdiction of the court. . . . [A]ny time an action taken by a judge is not an adjudication between two parties, it is less likely that the act is a judicial one." *Cameron v. Seitz*, 38 F.3d 264, 271 (6th Cir. 1994) (citation omitted); *see also Huminski v. Corsones*, 396 F.3d 53, 75 (2d Cir. 2005) (same). Granting a carry license falls outside of this paradigm. There is only one party in a carry license application: the applicant. There is no hearing, no docket, no opinion, and no order or judgment. Instead, an applicant fills out a form and submits it (along with a $30.00 fee) to the probate court. The processing probate judge then requests a background check from the police. Unless the application or the background check discloses a reason for denying the application, the probate judge must grant the applicant a license. O.C.G.A. § 16-11-129(d)(4). And the license, once granted, is just that—a license, not a court order.

Given the lack of *any* of the hallmarks of judicial action, it should be unsurprising that Georgia is an outlier in assigning responsibility for granting a carry license to probate judges. In addition to the states mentioned in Plaintiffs' motion for summary judgment, *see* Pls.' Mot. at 10,

it should be noted that in each of the five states bordering Georgia (including the only other two states in the Eleventh Circuit) the responsibility falls to sheriffs, Ala. Code § 13A-11-75; N.C. Stat. §14-415, the Department of Safety, Tenn. Code Ann. § 39-17-1351, the Department of Agriculture, Fla. Stat. § 790.06, and the State Law Enforcement Division, S.C. Code § 23-31-215. None assign the task to judges.

The Probate Judges offer several arguments why, despite all this, the Probate Judges are preforming a judicial function when they grant license applications, but none is persuasive. First, the Probate Judges argue that, because only judges may review carry license applications in Georgia, it must necessarily be a judicial function. *See* Judges' Opp. 11. But this argument proves too much. Under the Probate Judges' reasoning, *any* action assigned to a Probate Judge, because of the identity of the official who took it, would be a judicial action. As Plaintiffs noted in their motion, Georgia has long recognized that probate judges are charged with "duties judicial, ministerial and clerical" and that "[n]ot by his title, but only by his acts, can the exact capacity in which he appears ever be known upon any special occasion." *Comer v. Ross*, 28 S.E.387, 387 (Ga. 1897).[1] So even accepting the theory that to whom Georgia assigned responsibility for processing weapons carry licenses matters, that it chose probate judges is not informative. And in any event, that theory should not be accepted. The Supreme Court has repeatedly emphasized that "it [is] the

---

[1] The Probate Judges criticize Plaintiffs for citing *Comer* as their "only Georgia authority" on this point and emphasize that *Comer* predates Georgia's carry licensing regime and does not decide whether a Probate Judge acts in a judicial capacity when processing weapons carry applications. Judges' Opp. 15. But Plaintiffs merely rely on *Comer* for the point that the probate judge (or "ordinary" as it used to be called) plays a mixed, not a purely judicial, role in Georgia's state system and has done so for over 100 years. And no Georgia court has ever determined whether the weapons licensing function performed by a probate judge is judicial or not, which is why Plaintiffs turned to two out-of-state-cases that held, under similar regimes, it is not. *Application of Dailey*, 465 S.E.2d 601, 610 (W.V. 1995); *In re Preis*, 573 A.2d 148, 151 (N.J. 1990). The Probate Judges do not engage with these cases.

nature of the function performed, not the identity of the actor who performed it, that inform[s judicial] immunity analysis." *Forrester*, 484 U.S. at 229. The Georgia legislature cannot convert granting a carry license into a judicial function simply by directing judges to perform it. *See* Judges' Opp. 11 ("[T]he legislature chose to commit [license] evaluation to *judges* rather than to clerical or executive officials."). For immunity purposes, the Probate Judges' title is irrelevant.

Next, the Probate Judges argue that certiorari is available to an applicant who wishes to appeal his or her application denial and that suggests the granting of a license is a judicial function. *See* Judges' Opp. 12–13. But this argument begs the question. No statute says that denials of a weapons carry license may be reviewed by seeking certiorari. Instead, the Probate Judges note that Georgia law provides that certiorari is available "for the correction of errors committed by any inferior judicatory or any person exercising judicial powers, including the judge of the probate court, except" in cases not relevant here. O.C.G.A. § 5-4-1(a); Judges' Opp. 13. The cited statute does not apply on its own terms *unless* the judge in question is "exercising judicial powers," so in order to assert it has any application here, the Probate Judges have to assume exactly what they suggest it proves—that the granting of a carry license involves exercise of "judicial powers." The Probate Judges do not cite a single case (and Plaintiffs are aware of none) where a court granted certiorari from such a decision.

In fact, the existence of certiorari as a general avenue for relief from a *judicial* decision by a probate judge is informative in this case, but in the opposite way the Probate Judges intend. Certiorari and mandamus are incompatible forms of relief. Where certiorari is provided for, mandamus is inappropriate. *See City of Cumming v. Flowers*, 300 Ga. 820, 797 S.E.2d 846 (2017); *McClung v. Richardson*, 232 Ga. 530, 531, 207 S.E.2d 472 (1974). Although the Probate Judges have cited no evidence that anyone has ever sought (or had granted) a writ of certiorari from a

probate judge's license denial, the statute specifically prescribes mandamus as the avenue for relief from an adverse license decision. O.C.G.A. § 16-11-129(j). It is telling that, despite the availability of certiorari for "correction of errors committed by . . . [a]ny person [including a probate judge] exercising judicial powers," O.C.G.A. § 5-4-1(a), and furthermore, the right to appeal "to the superior court from any decision made by the probate court," O.C.G.A. § 5-3-2, the Carry Ban acts as though neither avenue is available and provides only for mandamus, a writ that, unlike certiorari, may be sought against executive officials as much as judicial ones, *see, e.g., S. View Cemetery Ass'n v. Hailey*, 199 Ga. 478, 482–83, 34 S.E.2d 863, 867 (1945).

## C. Quasi-Judicial Immunity Cannot Apply to the Probate Judges in Any Context.

The Probate Judges next argue that, even if their actions are only "quasi-judicial" in character, that is enough to grant them judicial immunity. Judges' Opp. 13–14. In doing so, they appear to conflate a few different ideas. First, "quasi-judicial immunity" is a discrete form of immunity that does not apply to judges but rather applies to non-judicial officers who act as an "arm of the judge" such that they are entitled to share in the judge's immunity. *Withers v. Schroeder*, 304 Ga. 394, 399–400, 819 S.E.2d 49, 54 (2018); *see also Roland v. Phillips*, 19 F.3d 552, 555 (11th Cir. 1994). It has no application here, where the Probate Judges' claim to immunity is based on their own status as judges and is not derived from some other official's exercise of judicial power. *See Roland*, 19 F.3d at 555. Second, the Probate Judges cite several cases that do not deal with the applicability of immunity at all but rather focus on the availability of certiorari as a remedy. *See* Judges' Opp. at 14–15 (citing *Mack II v. City of Atlanta*, 227 Ga. App. 305, 489 S.E.2d 357 (1997); *Riverdale Land Grp., LLC v. Clayton Cnty.*, 354 Ga. App. 1, 840 S.E.2d 132 (2020); *Salter v. City of Thomaston*, 200 Ga. App. 536, 409 S.E.2d 88 (1991)). These cases do discuss "quasi-judicial" powers or functions, which is a term of art in the certiorari context, O.G.C.A. § 5-4-1(a), but is unrelated to "quasi-judicial immunity" discussed above and has no

12

purchase in the judicial immunity context, *see Sibley v. Lando*, 437 F.3d 1067, 1070 (11th Cir. 2005) (considering whether "the act complained of constituted a *normal judicial function*" or "the confrontation arose immediately out of a visit to the judge *in his judicial capacity*") (emphasis added). Even so, the cases they cite demonstrate that processing applications for carry licenses would not even qualify as "quasi-judicial" in the certiorari context. There are "three essential characteristics of a quasi-judicial act," all of which must be met: (1) "all parties are as a matter of right entitled to a notice and to a hearing, with the opportunity afforded to present evidence under judicial forms of procedure"; (2) there must be "a decisional process that is judicial in nature, involving ascertainment of the relevant facts from evidence presented and an application of pre-existing legal standards to those facts"; and (3) it must result in a decision that is "final, binding, and conclusive of the rights of the interested parties." *Hous. Auth. of the City of Augusta v. Gould*, 305 Ga. 545, 551, 826 S.E.2d 107, 112 (2019). Processing a carry license application could only even arguably meet the last of these requirements. The failure to meet the first two, although again not directly relevant in this case, nevertheless underscores that judicial immunity is inappropriate here.

## III.    The Carry Ban Violates Plaintiffs' Second Amendment Rights.

### A.  This Constitutional Issue Has Been Adequately Briefed and May Be Adjudicated.

The Probate Judges argue that this Court should not even consider ruling on the merits of Plaintiffs' constitutional challenge because, the Probate Judges hypothesize, the Court could theoretically grant the Commissioner's motion to dismiss but not the Probate Judges', leaving this case without a state defendant to defend the constitutionality of the law. Judges' Opp. 7. This, they allege, would run afoul of Federal Rule of Civil Procedure 5.1, which requires any party challenging the constitutionality of a state statute to notify the Attorney General of the challenge to allow the state to defend its law. Judges' Opp. 6. But Rule 5.1 only applies in cases where a

plaintiff has not named "the state . . . or one of its officers or employees in an official capacity"
and nowhere requires that the state officer *remain* in the case. As the Commissioner concedes,
"[t]he Attorney General has received notice of this challenge," Rule 5.1 does not apply, and the
Court may consider the merits of Plaintiffs' suit. Comm'r Opp. 16 n.6.

**B. The Second Amendment Protects 18-to-20-Year-Olds' Right to Carry a Handgun in Public for Lawful Purposes.**

As Plaintiffs explained in their motion for summary judgment, the Second Amendment by
its own language ("the right of *the people*"), its context within the Bill of Rights (the First and
Fourth Amendments, which also use the phrase "the people," apply regardless of age), and its
historical background (18-year-olds were members of the militia in every state "near the time of
ratification"), includes all adults at least 18 years old. *See* Pls.' Mot. at 14. And the Amendment's
protection of the right to "bear arms" indicates that it protects the right to carry guns outside the
home just as it protects the right to keep them inside the home. *See* Pls.' Mot. at 15. *Heller*, 554
U.S. 570, 584, 592 (Amendment protects the right to " 'be[] armed and ready' " "in case of
confrontation.") (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998)).

None of the defendants engage with the textual or historical analysis Plaintiffs offered in
their motion, but each takes issue with different parts of Plaintiffs' conclusion. The Probate Judges,
for their part, suggest that the right to carry firearms is entitled to lesser protection than the right
to own them, because "the core Second Amendment concern of home defense is not implicated by
unavailability of a [carry license]." Judges' Opp. 8. But as Plaintiffs explained in their motion, the
Second Amendment does not create tiers of rights with some located at its "core" and other rights,
less deserving of protection, on its periphery. Pls.' Mot. 19 n.4. That the text of the Second
Amendment covers both the rights to "keep" and to "bear" arms is enough to dismiss the Probate
Judges' objection. *See Heller*, 554 U.S. at 584 ("[T]he natural meaning of 'bear arms'" is to "wear,

14

bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'"). Indeed, both the Seventh and D.C. Circuits have held, on this basis, that the right to carry is every bit as important as the right to keep. *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012); *Wrenn*, 864 F.3d 650, 658 (D.C. Cir. 2017). The Probate Judges do not engage with these cases.

At any rate, even if the right to carry firearms in public were accorded to some lesser degree of protection than the right to possess them in the home, it would not follow that Georgia may flatly bar 18-to-20-year-olds from exercising that right. In the First Amendment context, for example, regulations that touch on the periphery of the right nevertheless are subject to heightened scrutiny. *See, e.g., Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). *Heller* accordingly rejected rational basis review for Second Amendment claims. *See* 554 U.S. at 628 n.27. And the Probate Judges fail to raise any substantial argument that the Carry Ban could pass heightened scrutiny.

The Commissioner, on the other hand, does not question that the Second Amendment covers the right to carry arms in public, but cites cases that have upheld various restrictions on the exercise of that right by individuals under 21. *See* Comm'r Opp. 16. Although he does not engage in the analysis himself or thoroughly argue the point, the Commissioner endorses the approaches of a pair of Fifth Circuit cases and several district court cases, including one recent in-circuit decision from the Northern District of Florida. These cases are not persuasive and the Commissioner does not attempt to buttress their reasoning.

In *Nat'l Rifle Ass'n of Am., Inc. v. BATFE* ("*NRA I*"), 700 F.3d 185, 204 (5th Cir. 2012), the panel suggested (but did not hold) that a ban on 18-to-20-year-olds purchasing handguns from federally licensed firearms dealers was sufficiently rooted in history and tradition to pass

constitutional muster without engaging in a scrutiny analysis. But as Judge Jones painstakingly detailed in her dissent from denial of en banc rehearing, the *NRA I* "panel's treatment of pertinent history does not do justice to *Heller*'s tailored approach toward historical sources" and "[a] methodology that more closely followed *Heller* would readily lead to the conclusion that 18-to 20-year-old individuals share in the core right to keep and bear arms under the Second Amendment." *Nat'l Rifle Ass'n, Inc. v. BATFE* ("*NRA II"*), 714 F.3d 334, 336 (Jones, J., dissental). The *NRA I* panel emphasized that, at the founding and indeed up until the 1970s, people under 21 were considered "minors" and so concluded that "it stands to reason that" founding-era citizens "would have supported restricting an 18-to-20-year-old's right to keep and bear arms." 700 F.3d at 201–02.[2] But discussions of the changing perceptions of the age of majority and its social importance are beside the point here. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35.  As Judge Jones explained, "those [18-to-20-year-old] minors were in the militia *and, as such*, they were required to own their own weapons. What is *inconceivable* is any argument that 18-to-20-year-olds were not considered, at the time of the founding, to have full rights regarding firearms." *NRA II*, 714 F.3d at 342 (Jones, J., dissental) (emphasis in original).

The failure to account for militia service is another key weakness of the *NRA I* decision. The "prefatory clause" to the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State . . ." U.S. CONST. amend. II. Although this clause does not "limit or expand the scope of the operative clause," "[l]ogic demands that there be a link between

---

[2] The Commissioner also emphasizes that this reasoning was a motivating factor in *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 993 (W.D. Wash. 2020). Comm'r Opp. 16 n.7.

the stated purpose and the command." *Heller*, 554 U.S. at 577–78. The prefatory clause "announces the purpose for which the right was codified: to prevent elimination of the militia." *Id.* at 599. Therefore, although the Second Amendment right is not coextensive with the duty to serve in the militia (it is unquestionably broader and includes, for example, women), logic demands that its protections extend *at least* to those the Framers understood to constitute the militia. Any other reading would sever the "link between the stated purpose and the command," contrary to the instruction of *Heller*. *Id.* at 577–78.

Given the weight assigned to them in *Heller*, one might reasonably expect *some* discussion of the founding-era militia laws in *NRA I*, but the panel only mentioned them in a single footnote and they played no role in the ultimate decision in the case. 700 F.3d 205 n.17. "From a historical perspective, it is more than odd that the [*NRA I*] panel relegated militia service to a footnote." *NRA II*, 714 F.3d at 339 (Jones, J., dissental). Odd *and* crucial to the outcome of the case; *NRA I*'s conclusions cannot withstand even brief contact with the Founding-era militia laws. As Judge Jones explained, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." *NRA II*, 714 F.3d at 340 (Jones, J., dissental) (emphasis added); *see also Hirschfeld v. BATFE*, 5 F.4th 407, 453–57 (4th Cir. 2021) (collecting Founding-era militia laws), *vacating as moot*, --- F.4th ----, 2021 WL 4301564 (4th Cir. Sept. 22, 2021). *NRA I*'s failure to engage with this important history, and its emphasis on irrelevant issues like the age of majority, should lead this Court to disregard the flawed conclusions that flow directly from those errors.

The other Fifth Circuit case the Commissioner cites, *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013), did not add anything to the analysis from *NRA I*. It concluded that "age-based restrictions on access to and use of firearms" by those 18-to-20-years-

old were constitutionally permissible based on the flawed reasoning of *NRA I*. *Id.* at 347. The same is true of *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325–27 (S.D. Cal. 2020). And in *Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*, --- F. Supp. 3d ----, 2021 WL 2592545 (N.D. Fla. June 24, 2021), which the Commissioner points to as the only in-circuit authority that has "observ[ed] that restrictions on the sale of firearms to, and use of firearms by, those under 21 are longstanding and do not conflict with any founding-era understanding of the guarantees of the Second Amendment," Comm'r Opp. 16, the court relied heavily on post-ratification history while dismissing the uniformity of Founding-era evidence. Indeed, after acknowledging that every state at the Founding set the age of militia participation at or below 18, that the federal government set the age at 18 in the 1792 Militia Act, and that shortly after the Second Amendment's passage every state standardized the age for militia participation at 18, the court remarked that "ratification is just one snapshot in time" and turned to post-ratification practices. *Swearingen,* 2021 WL 2592545, at *7–8. But ratification is the *most important* time period for understanding the scope of the Second Amendment. True, *Heller* considered post-ratification history because "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation," *Heller*, 554 U.S. at 605, but *Heller* treated these post-ratification sources "as mere confirmation of what the Court thought had already been established" by sources from (and predating) ratification, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019). To the extent post-ratification traditions are inconsistent with the original understanding of the amendment, the original understanding controls. *See id.*; *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

The court in *Swearingen* violated that fundamental principle. The Founding-era evidence points exclusively in favor of finding the Second Amendment protects all citizens who are at least 18 years old. The evidence was exhaustively surveyed in *Hirschfeld*, on which Plaintiffs focused in their opening brief and to which neither the Probate Judges nor the Commissioner offer any response on the merits. The Probate Judges attempt to distinguish the case by noting that it was "about *buying* guns from particular gun sellers, not about carrying them around in public," Judges' Opp. 8, but this is a distinction without a difference. Before the court in *Hirschfeld* could decide whether a restriction on buying guns implicated the Second Amendment, it had to answer a predicate question: whether the Second Amendment applied to the 18-to-20-year-old plaintiffs at all. That same question must be answered here, and *Hirschfeld*'s conclusion that "the Constitution's text, structure, and history affirmatively prove that 18-year-olds are covered by the Second Amendment" is instructive even though the ultimate legal issue the court decided differs from the one at issue here. 5 F.4th at 440.

The Commissioner does not even attempt to distinguish *Hirschfeld*. Instead, he notes that the opinion was vacated (on mootness grounds) and "is no longer precedential." Comm'r Opp. 17. Although it has been vacated, "the exchange of ideas between the panel and dissent . . . remain available as a persuasive source." *Hirschfeld*, 2021 WL 4301564, at *2. In this case, that was all *Hirschfeld* ever was anyway and, for that matter, the same objection could be leveled at *NRA I* or *McCraw* or any of the district court cases cited by the Commissioner. Plaintiffs have never suggested that *Hirschfeld* is binding, just that it is right. Plaintiffs *still* argue it is right—and it is telling that no Defendant offers one argument to the contrary.

**C.  No Level of Scrutiny Is Appropriate for Assessing the Carry Ban's Constitutionality.**

The Commissioner acknowledges that there is, as yet, no definitive method for adjudicating Second Amendment claims in the Eleventh Circuit, which has suggested tiers-of-scrutiny analysis is "appropriate" but has never applied it. Comm'r Opp. 15 (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012)). The Commissioner also recognizes that "many jurists have concluded that text, history, and tradition are dispositive in determining whether a challenged law violates the right to keep and bear arms." *Id.* (quoting *Rogers v. Grewal*, 140 S. Ct. 1865, 1866 (2020) (Thomas, J., dissenting)). Indeed, the Eleventh Circuit has suggested that tiers of scrutiny may not be necessary at least in cases where a law "destroys the Second Amendment right altogether." *GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1325 (quotations omitted).

The Probate Judges argue that the Carry Ban does not "destroy" the Second Amendment right of Plaintiffs who are still free to own guns and to keep them in their homes for home defense, which the Judges label "the core Second Amendment concern." Judges' Opp. 8. But as discussed above, the Probate Judges' focus on a "core" right that excludes carriage is contrary to *Heller* and has no basis in the text or history of the Second Amendment. Nor does it matter that the Carry Ban does not impact the right to keep arms. "[P]ossession and carrying are on par with each other" and "if the Amendment is for law-abiding citizens *as a rule*, then it must secure gun access at least for each *typical* member of that class" as a rule. *Wrenn*, 864 F.3d at 664. That the Carry Ban does not is sufficient to render it categorically unconstitutional.

**D.  Even Applying Intermediate Scrutiny, the Defendants Have Failed to Adequately Demonstrate a Government Interest That Is Served by the Carry Ban.**

Ultimately, the decision of whether to apply a tiers-of-scrutiny analysis does not make a difference in this case. At the very least, intermediate scrutiny must apply. Rational basis may "not

be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms." *Heller*, 554 U.S. at 628 n.27; *see also Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1311 (11th Cir. 2017) (same). In fact, even the dissenters in *Heller* would not have entrusted the fate of firearms regulations to rational basis review. 554 U.S. at 689 (Breyer, J., dissenting) ("[R]eview of gun-control regulation is not a context in which a court should effectively presume . . . constitutionality (as in rational-basis review).").

Under intermediate scrutiny, the State bears the burden of justifying its law by identifying "an important governmental objective" and demonstrating the challenged law is "substantially related" to advancing that objective. *Danskine v. Miami Dade Fire Dept.*, 253 F.3d 1288, 1294–95 (11th Cir. 2001). Unlike rational basis review, the Court may not speculate as to what interests could have motivated the State in passing the challenged laws; it must base its decision on the interest advanced by the State. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 (1995). And that interest "must be genuine, not hypothesized[, ]invented *post hoc* in response to litigation," or rely "on overbroad generalizations." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Here, neither the Commissioner nor the Probate Judges even suggest a genuine government interest that motivated Georgia in enacting the Carry Ban, let alone offer evidence of one. That failure is fatal.

Even if the Defendants had demonstrated a supporting government interest, they have also failed to make any attempt to show that the Ban is "substantially related" to that objective. "The burden of justification is demanding and it rests entirely on the State." *Id.* "Unsupported generalizations will not suffice" to meet this burden, *Danskine*, 253 F.3d at 1294, and "some reference to legislative findings, academic studies, or other empirical data is necessary to support the categorical disarmament of citizens," *Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 837 F.3d 678,

21

694 (6th Cir. 2016). In *Ezell v. City of Chicago*, 651 F.3d 684, 709 (7th Cir. 2011), the Seventh Circuit found Chicago had "not come close to satisfying [a similar] standard" because "the City presented no data or expert opinion to support the [challenged] range ban, so we have no way to evaluate the seriousness of its claimed public-safety concerns." The situation is worse here—the Defendants have not offered any interest *or* any data to support the Ban.  Plaintiffs have presented such data, and though it is unnecessary to this Court's decision since the burden is on the Defendants and they have made no attempt to carry it, the data conclusively demonstrates that no justification could support targeting an entire age cohort of adults because a miniscule portion of them violate the law. *See* Pls.' Br. 22; *Craig v. Boren*, 429 U.S. 190, 201–02 (1976).

Only the Probate Judges offer any response at all to Plaintiffs' statistical arguments. They suggest "statistics can be incomplete, cherry-picked or otherwise provide a misleading picture for a variety of reasons" and that "some statistics apparently tend to support" the Ban. Judges Opp. 9. But the statistics Plaintiffs cited are all publicly available and collected by the Bureau of Justice Statistics—if they had been cherry-picked or were misleading, it would be easy enough for the Probate Judges to demonstrate that rather than insinuate it. And similarly, the Probate Judges assert the statistics are "pure hearsay" and "not entitled to any consideration," but do not explain why. Judges' Opp. 5. As long as the statistics could be admitted at trial, they may be considered by the Court. *See Macuba v. Deboer*, 193 F.3d 1316, 1325 (11th Cir. 1999). All statistics cited by Plaintiffs qualify as public records that are excepted from the hearsay rule, and the Probate Judges have offered no argument or explanation for why they are not reliable. *See* Fed. R. Evid. 803(8); *see Trull v. Volkswagen of Am., Inc.*, 187 F.3d 88, 97 (1st Cir. 1999).

In any event, these rules do not apply, because the statistics Plaintiffs rely on are legislative and not adjudicative facts.[3] The Seventh Circuit's decision in *Moore* is instructive. There, district courts granted motions to dismiss in two cases challenging Illinois's law generally banning law-abiding citizens from carrying firearms outside the home. 702 F.3d at 942. The Seventh Circuit reversed, but rather than remanding for discovery, summary judgment, and (if necessary) trial, it ordered judgment entered for the plaintiffs. In the process, it surveyed extensively social science literature on the public safety implications of carrying firearms in public. *See id.* at 937–39. After doing so, the court reasoned, "there are no evidentiary issues in these two cases" because "the constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." *Id.* at 942. Instead, the cases turned on "legislative facts," *i.e.*, "facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case." *Id.* Other courts adjudicating Second Amendment claims similar to those presented here frequently engage directly with information similar to what Plaintiffs have cited in their summary judgment brief, with no "hearsay" concerns. *See, e.g.*, *Hirschfeld*, 5 F.4th at 444–47; *NRA I*, 700 F.3d at 209–11. These examples could be multiplied many times over in decisions of the U.S. Supreme Court and the federal Circuit Courts addressing claims involving all manner of constitutional rights.

---

[3] "Adjudicative facts are those developed in a particular case," *Robinson v. Liberty Mut. Ins. Co.*, 958 F. 3d 1137, 1142 (11th Cir. 2020) (brackets omitted), and "concerning the immediate parties," such as "who did what, where, when, how, and with what motive or intent," FED. R. EVID. 201(a) advisory committee's note to 1972 proposed rule. Legislative facts, by contrast, "do not change from case to case but apply universally." *Robinson*, 958 F.3d at 1142. A paradigmatic example of legislative facts "are those which have relevance to legal reasoning and the lawmaking process," *id.* (quoting Fed. R. Evid. 201(a) advisory committee's note to 1972 proposed rule) (cleaned up), such as the alleged justifications for the carry ban at issue in this case.

23

As a result of the Defendants' failure to provide any substantial government interest that could support the Carry Ban and their failure to engage at all with Plaintiffs' statistical evidence showing that no such interest could support the Ban, the issues presented by Plaintiffs' motion for summary judgment are considerably simplified. Regardless of whether the Court applies a tiers of scrutiny analysis, if it finds that the Second Amendment protects the right to carry firearms by 18-to-20-year-olds, it must find the Carry Ban unconstitutional and grant Plaintiffs' motion for summary judgment.

**<u>Conclusion</u>**

For the foregoing reasons and those contained in Plaintiff's Motion for Summary Judgment, the Court should grant Plaintiffs declaratory and injunctive relief.

October 12, 2021                                   Respectfully Submitted,

John R. Monroe                                     /s/ David H. Thompson
John Monroe Law, P.C.                              David H. Thompson
156 Robert Jones Road                              Peter A. Patterson
Dawsonville, GA 30534                              William V. Bergstrom
(678) 362-7650                                     Cooper & Kirk, PLLC
jrm@johnmonroelaw.com                              1523 New Hampshire Avenue, N.W.
State Bar No. 516193                               Washington, D.C. 20036
                                                   (202) 220-9600
                                                   (202) 220-9601 (fax)
                                                   dthompson@cooperkirk.com
                                                   ppatterson@cooperkirk.com
                                                   wbergstrom@cooperkirk.com
                                                   Admitted *pro hac vice*

                                                   *Attorneys for Plaintiffs*

24